[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 377 
Kenneth Glenn Thomas was charged in a four-count indictment with intentional murder *Page 378 
during the course of a burglary (in violation of §13A-5-40(a)(4), Code of Alabama 1975), arson in the first degree (in violation of § 13A-7-41, Code of Alabama 1975), robbery in the first degree (in violation of § 13A-8-41, Code of Alabama 1975), and sexual abuse in the first degree (in violation of § 13A-6-66, Code of Alabama 1975). The jury found this appellant guilty on all four counts of the indictment and unanimously recommended death as punishment for the capital offense of burglary/murder. The trial judge sentenced the appellant to death for the capital offense and to life imprisonment without parole on the robbery, arson, and sexual abuse verdicts as judgments of conviction.
At approximately 2:00 a.m. on December 15, 1984, Veronica Grizzard was driving down East Street in Athens, Alabama, with two of her friends. As Grizzard passed the Athens Middle School, she noticed smoke coming from a house across the street from this school. Grizzard went to a neighboring house and awakened one Jerry Stephens. Stephens' wife telephoned the Athens Fire Department.
Stephens then went to the burning house which was located at 521 East Street and threw rocks through the windows in an attempt to arouse the occupant of the house, Flossie McLemore. The front and back doors were too hot to open.
At this time, the fire department arrived. The firemen began fighting the fire at the front of the house. After a few minutes, one of the firemen, Jerry Day, was able to enter the house. He found the body of Flossie McLemore lying on her back in the middle bedroom of the house.
The victim was naked except that her green nightgown was pulled up around her chest. Her legs were spread in an unnatural position, with one leg in the hallway and the other around the corner of the door into the bedroom. The coroner was called to the scene and the house was secured.
The firemen noticed the house was in shambles and they noticed blood all over the house. The kitchen stove and oven were on and the oven door was open. There were cloth items on the oven door and some burning paper inside the oven in a frying pan. However, the firemen stated that the oven was not the cause of the house fire. The living room was the most heavily damaged part of the house.
Several Athens police officers came to the scene shortly after the firemen arrived. One of the officers noticed a red Chevrolet parked in the parking lot of the Athens Middle School.
When the officers walked up to the car, one of them saw a man lying down on the front seat of the car. At this point, the man raised up and one of the officers recognized the man as this appellant. The appellant had blood all over his chest and pants, and he smelled of alcohol.
At this point, the appellant became belligerent and began cursing. He was asked to get out of the car and he was placed under arrest for public intoxication. One of the police officers "patted down" the appellant, and he found a rusty knife and some blood-soaked bills in the appellant's pants pocket.
The appellant then jumped back in the car and locked the doors. The appellant was persuaded to exit the car and one of the policemen found a knife on the front seat of this car. The knife had some blood and hairs on it.
The appellant kept insisting to the police officers that he hadn't done anything. He said that he had blood on him because he had been in a fight that night and had cut someone "real bad" at 31 Blue Spot in Ardmore, Tennessee.
The appellant was then handcuffed and taken to the police station. It took several officers to put him in the police car.
An autopsy was performed on the body of the victim by Dr. Joseph Embry. The autopsy revealed numerous wounds, bruises, and abrasions to the body of the victim. Embry found numerous post-mortem wounds to the victim's neck, chest, abdomen and pubic area.
Embry also found the existence of several ante-mortem wounds. There was a deep tear in the back wall of the vagina which *Page 379 
extended to the area between the vagina and the rectum. Embry found several other tears to the vagina and rectum and numerous cuts to the buttocks area. Embry stated that the wounds to the vagina and rectum were inflicted with a blunt instrument using considerable force and were indicative of sexual abuse. Embry also stated that some of the stab wounds and cuts were consistent with having been made by a knife.
The victim also sustained several broken ribs. However, Embry stated that none of the above described injuries were life-threatening. Embry testified that the victim died as a result of asphyxiation caused by a hand or similar instrument applied with force. There were bruises and tears inside the mouth as well as marked hemorrhaging.
After the appellant was placed in jail, his clothes were confiscated. There was blood all over his body, including his pubic area. The appellant had a cut to his hand between his third and fourth fingers.
On the morning of December 15, 1984, officers from the Athens Police Department, along with John Kimbrough of the Department of Forensic Sciences, began collecting evidence. Spots of blood were found leading from the doorstep of the victim's house through the yard and across the street to the point where the appellant's car had been parked. A blood-soaked Kleenex was found in the street.
The appellant and the victim both were type "0" in the ABO blood type system. However, in the PGM system, the appellant is "type one" and the victim was "type two one."
The spots of blood leading from the house to the appellant's car were consistent with the appellant's blood type as was the blood found on the Kleenex. A cloth found inside the appellant's car had bloodstains consistent with the appellant's and the victim's blood types.
The officers found what appeared to be screwdriver marks on the window facing the front bedroom at the victim's house. There was blood on the inside wall of this window. In this bedroom, the mattress was shoved to the side of the bed and the contents of the dresser drawers were scattered on the floor. A pillow case was found under some insulation on the floor. The pillow case contained some money and jewelry and a car key. The key was to the ignition of the appellant's car. A bloodstained shirt was also found in this bedroom.
A hair found on this shirt was consistent with the defendant's hair. The appellant was identified as having worn this shirt earlier on the night in question.
The rest of the house was similarly in shambles. Every drawer, closet, and cabinet had been opened and the contents of each strewn about. Bloodstains were found all over the house, but only a few could be typed due to the heat from the fire. Two of the bloodstains were consistent with the appellant's blood type.
A check with a bloody fingerprint on it was found in the storage room of the victim's house. It matched the known left thumb print of this appellant.
Two of the fibers from the knife found inside the appellant's car were similar to fibers from the victim's nightgown and a blanket on her bed. Hair fragments from the knife were consistent with the head and pubic hair of the victim. Trace fibers from the appellant's jeans were consistent with the victim's nightgown. A hair consistent with the victim's was also found on the appellant's jeans.
Brenda Presnell testified that she was following a red Chevrolet on the night of December 14, 1984, at approximately 11:45 on her way home from work. The car pulled into the parking lot of the Athens Middle School, and the person in the car had curly hair similar to the appellant's.
Penny Corum stated that she was driving home on the night of December 14, 1984, near midnight. She stopped at the corner of East Street and Forrest Avenue and noticed a man crossing the street from the Athens Middle School parking lot. As she turned the corner, she saw the man in the victim's front yard. She identified this man as the appellant. *Page 380 
The appellant presented numerous witnesses who testified as to the appellant's unfortunate childhood. The appellant's father, who was a big influence on the appellant, was an alcoholic and he spent many years in prison. The father died a few weeks before this murder. During his childhood, the appellant was moved from foster home to foster home.
The defense also introduced evidence that the appellant was borderline mentally retarded and a paranoid schizophrenic. They also introduced testimony from a psychologist who believed the appellant had suffered brain damage from the overuse of drugs.
The appellant testified in his behalf. He stated that his father was a role model for him and that he was with his father when he would strip cars and set fires. The appellant also testified that he had used various types of drugs from 1978 until 1983.
The appellant's testimony concerning the night in question was similar to the statement he gave the police. He stated that he went to work on December 14, 1984, and smoked marijuana throughout the day. That night, he went to a party and smoked pot and drank beer and whiskey. When he left the party, he went to 31 Blue Spot in Ardmore, Tennessee. He beat a guy in cards and this person cut him on his hand as he was leaving the club.
The appellant then returned to Athens. His car went dead in front of the Athens Middle School. The appellant got out of his car and began walking home through the victim's yard to his house which was located on the next block.
The appellant noticed the front door to the victim's house was open, and he went inside. He saw the victim lying on the floor and he "freaked out." The next thing he remembered was waking up in his car.
The State presented two witnesses on rebuttal who testified that they had evaluated the appellant and found him to be competent to stand trial. These witnesses were on the lunacy commission, which examined this appellant.
 I A
During the voir dire examination of the jury venire, defense counsel challenged eight jurors for cause on the grounds that each of these jurors had a fixed opinion as to this appellant's guilt. The trial judge granted five of these challenges. The appellant contends on appeal that the trial judge erroneously denied the other three challenges for cause.
Section 12-16-150, Code of Alabama 1975, provides that, when a juror "has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict," a challenge for cause is proper. Nobis v. State, 401 So.2d 191
(Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala. 1981). The juror must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. The juror's opinion must be fixed to the point that it would bias the verdict which the juror would be required to render. Johnson v. State, 356 So.2d 769
(Ala.Cr.App. 1978); McCorvey v. State, 339 So.2d 1053
(Ala.Cr.App.), cert. denied, 339 So.2d 1058 (Ala. 1976);Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Crim.App. 1977), cert. denied, 356 So.2d 234 (Ala. 1978).
To determine whether the trial judge erred by denying these three challenges for cause, we must examine each of the juror's voir dire examination.
The following portion of the record is prospective juror Haney's voir dire examination:
"MR. FRY: Mr. Haney, how are you doing today? I'm Jimmy Fry from this morning. I have just a couple of things. Do you know anything about this case, Mr. Haney, that would prevent you from being able to sit on the jury and give a fair hearing to both sides of the house, that is, the prosecution and the defense?
"THE JUROR: No, sir.
"MR. FRY: After hearing all of the evidence and listening to the Judge instruct *Page 381 
you as to what the law is, can you follow the instructions he gives you?
"THE JUROR: Yes, sir.
"MR. FRY: Would you follow his instructions even if you didn't agree with what some of the law in Alabama is?
"THE JUROR: Yes, sir.
"MR. FRY: In other words, you would follow the law and not your own personal opinion?
"THE JUROR: Yes.
"MR. FRY: Thank you.
"MR. BARKSDALE: Mr. Haney, I'm Jerry Barksdale. How old are you, sir?
"THE JUROR: Twenty-one.
"MR. BARKSDALE: Tell us what you do know about the case from the media.
"THE JUROR: It's been a long time. I just know that he was — the lady was killed and stabbed, and then he set the house on fire. As far as that, that's all I know.
"MR. BARKSDALE: Well, after seeing that or reading it, in your mind, who did that? Who committed that crime?
"THE JUROR: Mr. Thomas.
"MR. BARKSDALE: You still feel that way?
"THE JUROR: Yes, sir.
"MR. BARKSDALE: Since you feel that way, would you feel that we, on the defense team, would have to prove to you that he didn't?
"THE JUROR: Yes, sir.
"MR. BARKSDALE: You feel that way pretty strongly?
"THE JUROR: No, sir, not strongly.
"MR. BARKSDALE: But that is your feeling right now?
"THE JUROR: Yes.
"MR. BARKSDALE: Your Honor, in view of Mr. Haney's honesty, I would say that we would want him excused for cause.
"MR. FRY: Judge, he just got through saying he would follow the instructions of the Judge and would give a fair trial.
"Are you saying, Mr. Haney, that you could put your personal feelings aside right now? Right now, are you saying there's a chance in your mind that he's guilty?
"THE JUROR: Yes, but there is a chance he's innocent.
"MR. FRY: But at the same time, if the Judge told you, when and if you become a juror, that he's presumed innocent, would you presume him innocent until the evidence was put on, assuming that it was, to prove that he was guilty?
"THE JUROR: Yes.
"MR. FRY: You could do that?
"THE JUROR: Yes.
"MR. FRY: You could lay aside whatever feeling you have about what you have read that might indicate otherwise; is that right?
"THE JUROR: Yes, sir.
"MR. FRY: You don't know whether he's guilty or not, do you?
"THE JUROR: No.
"THE COURT: Any other questions then?
"MR. BARKSDALE: Yes, sir. Mr. Haney, as I understand it, as of right this moment, you feel that Kenny Thomas is guilty; is that correct?
"THE JUROR: Yes, sir.
"MR. BARKSDALE: Your Honor, we renew our motion to excuse Mr. Haney for cause.
"THE COURT: If the law presumes him innocent, can you consider him innocent regardless of your personal opinion?
"THE JUROR: Yes.
"MR. BARKSDALE: Could you tell us, Mr. Haney, how you are going to reconcile this in your mind? You honestly told us that you feel like he was guilty as of now, but then you say that you can follow the Court's instructions. Tell us how you are going to do that.
"THE JUROR: That is just what I've heard and read. That's just in my mind right now. As far as if selected for the jury, all that can be set aside. *Page 382 
"MR. BARKSDALE: But what are we on the defense team going to have to do to set aside this in your mind?
"THE JUROR: Just prove that he's innocent, I guess.
"MR. BARKSDALE: Prove that Kenny Thomas is innocent?
"THE JUROR: Yes.
"MR. BARKSDALE: Your Honor, we, again, move to excuse Mr. Haney for cause.
"THE COURT: Well, I still think we are playing with words to a certain extent here.
"Did you say that you are not going to apply the presumption of innocence or you are going to apply the presumption of innocence? Either you are or you're not. I'm asking for a straight answer.
"THE JUROR: Yes, sir.
"THE COURT: He asked you the question, would you make them prove him innocent? Now, are you going to make them prove him innocent, or are you going to provide the presumption of innocence without them having to provide it?
"THE JUROR: Okay. I provide the innocence.
"THE COURT: You will provide the presumption of innocence? Are you going to make them prove him not guilty?
"THE JUROR: Yes, sir.
"THE COURT: Well, that's two different things. I guess we are putting you in a spot where we are talking about legal terms. The law says they don't have to prove him not guilty. Now, you keep saying you are going to make them prove him not guilty. Now, you haven't heard the instructions, but if the law is that they don't have to prove him not guilty, then are you going to make them do that any way?
"THE JUROR: No, sir.
"THE COURT: Do you understand what we are talking about?
"THE JUROR: A little bit.
"THE COURT: Mr. Fry, did you have anything you wanted to ask him?
"MR. FRY: No, sir.
"MR. BARKSDALE: Your Honor, I do. I want to make a record of this.
"Mr. Haney, what we want you to do is just tell us your honest to God feelings.
"Now, of course —
"THE COURT: Let me say this: Of course, there may be a difference in his feelings and what he's going to do.
"MR FRY: I believe that's right, Your Honor. I believe we're asking these people what their opinions are and not —
"THE COURT: I do not think the law requires that a juror not have any feelings or opinion. The law requires that he be able to try the case based upon the instruction of the Judge and evidence that comes to him, and that is the rule in U.S. vs. Murph the Surf. It is a Florida case. I think that's the rule where the U.S. Supreme Court announced that a juror may have personal feelings. The question is, in my mind, whether he could try this case based upon the evidence with the Court's instructions and subordinate any personal feelings, or if the personal feelings are going to overrule the law and evidence. I think that's the legal standard.
"MR. BARKSDALE: Well, Your Honor, I never did get to finish the question. I would like permission from the Court to further voir dire the juror on this issue if I may.
"THE COURT: Okay. I'm just saying that I can't consider questions that don't state the legal standard. The fact that he's got an opinion right now does not make him disqualified as a juror. The question is whether those feelings are going to control no matter what the evidence is. That's the legal standard as I understand it.
"MR. BARKSDALE: I would like to get on the record as clearly as possible what his present feelings are, and then pursue it from there.
"Mr. Haney, could you tell us just as honestly as you can right now, without feeling intimidated by me or anybody else, how you really feel about Kenny Thomas' guilt or innocence? *Page 383 
"THE JUROR: Well, right now, I feel he's guilty.
"MR. BARKSDALE: Now, I want you to tell us how you are going to put aside these feelings?
"THE JUROR: Well, this is just based on the news and what I have known. I don't know nothing about the case, not what kind of evidence is against him. It's just what I have heard. It's just based on the news.
"MR. BARKSDALE: Well, I guess my question is — and I'm not jumping on you. I'm just trying to get to the heart of this. I want you to understand that. Tell us how you are going to put aside these personal feelings.
"THE JUROR: I don't know, I don't guess.
"MR. BARKSDALE: Sir?
"THE JUROR: I don't know.
"MR. BARKSDALE: Well, if you don't know how you are going to do it, tell us how you can do it.
"THE JUROR: Well, that's just my personal feeling. Like I said, when I come to the jury, that's just my personal feelings. I don't know how to state it or nothing.
"MR. BARKSDALE: Are you going to be able to set these personal feelings aside?
THE JUROR: Yes, sir.
"MR. BARKSDALE: How are you going to do that?
"THE JUROR: Just throw them aside. I don't know.
"THE COURT: Are there any other questions then?
"MR. BARKSDALE: Not on that issue. Again, we renew our motion that he be excused for cause.
"THE COURT: Okay. Denied." (R. 310-20).
We do not find error in the trial judge's denial of the challenge for cause as to juror Haney. Although Haney at one point expressed the opinion that the appellant was guilty and the defense would have to prove him innocent, Haney later assured the trial court that he could set aside his personal opinion and could presume this appellant to be innocent. Haney's testimony did not reveal a fixed opinion as to the appellant's guilt which would make Haney unable to render an unbiased verdict. The challenge for cause as to Haney was properly denied. See Berard v. State, 486 So.2d 458
(Ala.Crim.App. 1984), rev'd on other grounds, Ex parte Berard,486 So.2d 476 (Ala. 1985), on remand, 486 So.2d 482 (Ala.Cr.App. 1986);Howard v. State, 420 So.2d 828 (Ala.Crim.App. 1982); Jarrellv. State, 355 So.2d 747 (Ala.Crim.App. 1978).
The voir dire examination of prospective juror Turpen follows:
"MR. FRY: Thank you for waiting around all afternoon. We've got a few more questions. We would like to go over some things again. We're not trying to insult your intelligence, but we're trying to make it perfectly clear how everybody feels about this stuff. Yesterday, you indicated, Mr. Turpen, that you had some knowledge of the case, I believe, through the television or newspaper or radio. Which was it, if you don't mind?
"THE JUROR: Both.
"MR. FRY: Do you get the News Courier?
"THE JUROR: Yes, I read the News Courier.
"MR. FRY: Have you seen the television — seen them on television?
"THE JUROR: Yes.
"MR. FRY: Do you know anything about the case other than what you have seen on TV?
"THE JUROR: Just on the TV and in the paper. Just what, you know, you hear through the neighborhood.
"MR. FRY: Do you have any personal knowledge of what may have happened?
"THE JUROR: No personal knowledge.
"MR. FRY: Did you read that a lady was killed, and a man was arrested?
"THE JUROR: Yes, uh-huh.
"MR. FRY: Do you believe, Mr. Turpen, that just because the police have arrested *Page 384 
someone that that makes him automatically guilty?
"THE JUROR: Well, not really. If they collect the evidence on it, how can you think otherwise?
"MR. FRY: In other words, if the evidence was —
"THE JUROR: If it was sufficient, I would believe it.
"MR. FRY: Yesterday, I asked you a question as to whether or not you understood the presumption of innocence in this country. The Judge is going to tell you, I believe, that the Defendant is presumed to be innocent until proven guilty by the State.
"THE JUROR: True.
"MR. FRY: And that the State has to come in and the burden is just on us to prove him guilty. He doesn't have to prove he's innocent.
"MR. MOFFATT: I object to the term, prove he's innocent. I know what Mr. Fry is trying to do, but I believe using those terms together is misleading. I object to them.
"THE COURT: Well, you are probably right. I'll sustain it.
"MR. FRY: You could go along with that that he's presumed to be innocent until proven guilty?
"THE JUROR: Yes.
"MR. FRY: You don't have any way of knowing whether he's guilty or innocent as you sit here today?
"THE JUROR: That's right.
"MR. FRY: If he's arrested, the police could be incorrect? Someone else could have committed the crime?
"THE JUROR: I don't believe so.
"MR. FRY: Well, if the Judge instructed you to presume that he's innocent, could you follow that instruction?
"THE JUROR: No, I couldn't. Not with all the evidence you've got.
"THE COURT: I didn't hear the last statement.
"THE JUROR: I said, no, I couldn't — what are you speaking of — if the Judge presumed he was innocent —
"MR. FRY: I'm not talking about at the end of the trial. I'm talking about right now. I hope you are talking about at the end of the trial.
"THE JUROR: I was. I misunderstood the question.
"MR. FRY: Let me ask you this: Would you be able to sit on the jury and hold judgment as to whether or not he was guilty or innocent until you heard all of the evidence?
"THE JUROR: Oh, yes.
"MR. FRY: Would you only convict this Defendant if you were convinced by the evidence that he was, in fact, guilty?
"THE JUROR: Would I only convict him?
"MR. FRY: Yes.
"THE JUROR: Well, surely.
"MR. FRY: If you weren't convinced by all the evidence, you would acquit him; is that correct? If at the conclusion of the trial you were not convinced that he was guilty —
"THE JUROR: If he didn't have the proper evidence and everything; I would.
* * *
"MR. MOFFATT: Let me ask you something about what you know about the facts of the case. I believe you said you read about it in the newspaper and heard about it on the TV and the radio?
"THE JUROR: I've read about it in the newspaper, and I heard about it on TV and just in the general area everybody hears about it.
"MR. MOFFATT: A lot of people know about it?
"THE JUROR: Right.
"MR. MOFFATT: Did you happen to know Mrs. McLemore or any of her family?
"THE JUROR: I didn't.
"MR. MOFFATT: What about the Thomas family? *Page 385 
"THE JUROR: I seen them. That's all. Personally know them, too.
"MR. MOFFATT: Do you have an opinion, right now, as to who did that thing?
"THE JUROR: Well, I've got an opinion, but I'll keep that to myself for the present time.
"MR. MOFFATT: Let me ask you about it. It's important. I wouldn't want to ask you to divulge something to us that you feel is private, but we need to know. It's important. If you would share that opinion with us, we'd appreciate it.
"THE JUROR: In my mind?
"MR. MOFFATT: Yes.
"THE JUROR: In my mind I've got that guilt feeling on him.
"MR. MOFFATT: Who is guilty?
"THE JUROR: Thomas.
"MR. MOFFATT: Is that a fixed opinion in you? Do you think it's going to be there?
"THE JUROR: It couldn't be a fixed opinion. I've got to see all the evidence and see what they have got to present, but they do have a stack of evidence.
"MR. MOFFATT: They do have a stack of evidence?
"THE JUROR; You explained that, yesterday. You've got all your forensic reports and stuff, and they are very accurate.
"MR. MOFFATT: What else do they have that you know of?
"THE JUROR: Where the man was picked up at, the trail of the blood, and all this stuff, but like I said, I would have to listen to it all to form a full opinion of it.
"MR. MOFFATT: Well, if I'm understanding what your opinion was a minute ago, and you correct me if I am wrong — does that trail in your mind right now lead to Kenny Thomas?
"THE JUROR: Well, that's the way it was according to the reports and everything, but I haven't seen the lab reports or the other stuff on it yet.
"MR. MOFFATT: Being honest, you have been very honest with us, if you are seated out there on that jury and we start a trial, would you have a bias against him?
"THE JUROR: Not necessarily.
"MR. MOFFATT: What do you mean, not necessarily?
"THE JUROR: Well, just like everything else, you've got to listen to it from the start and go to the end of it and then form your opinion.
"MR. MOFFATT: If you've told us, though, right now, you are thinking in your mind it might be guilty —
"THE JUROR: It could be changed.
"MR. MOFFATT: It could be changed?
"THE JUROR: It could go either way.
"MR. MOFFATT: Right now, starting from scratch, based on what you know right now, if we went out there starting the case, would we have to prove he was not guilty?
"THE JUROR: Yes.
"MR. MOFFATT: Would we have to do that more than the State would have to prove him guilty?
"THE JUROR: I think you would.
"MR. MOFFATT: I think you have been very honest with us. I appreciate you telling us that. Thank you very much, Mr. Turpen.
"MR. FRY: Let me go back a little bit, if I can. You made a statement that with all the evidence they have against him, meaning the State, are you basing that at least in part on Mr. Moffatt's questions yesterday when he asked you about forensic reports and that kind of thing?
"THE JUROR: Uh-huh.
"MR. FRY: That wasn't contained in any newspaper article or report that you have seen that there were forensic reports?
"THE JUROR: No, I don't remember seeing it. That's about the first thing I've heard about it.
"MR. FRY: He's asked you questions about what they would have to prove. If the Judge instructed you that they don't have to prove anything, and they don't have to put witnesses on but rather, that I have to prove that he's guilty, would you *Page 386 
be able to follow that instruction and only if you were convinced that he was guilty by my proof, convict the man?
"THE JUROR: You mean by the evidence?
"MR. FRY: Yes, sir, by the evidence.
"THE JUROR: I sure would. Just like I said, I've got that feeling here.
"MR. FRY: You said a moment ago that he would have to prove to you that he was innocent. What you mean is, after hearing all of the evidence; is that correct?
"THE JUROR: He would have to dispute your theory, in other words, and prove where you are wrong. If you are wrong, then I would go along with him. If you are correct, then I will go with you.
"MR. FRY: You wouldn't make that decision, however, until after you heard all of the evidence?
"THE JUROR: At the end of the trial. True.
"MR. FRY: I believe that's all.
"THE JUROR: You can't make a decision until the end of the trial.
"MR. MOFFATT: Thank you, Mr. Turpen.
(Juror excused.)
"MR. MOFFATT: Judge, we would strike for cause. I think his statements were very clear. I know Mr. Fry did his best to try to show he was following the presumption of innocence, but in all honesty, he said he believed him to be guilty, and we would have to prove him innocent.
"MR. FRY: He said he had a feeling, but he also said repeatedly that he would have to hear all of the evidence. I believe on redirect he said you would have to prove that he didn't do it. My impression was that what he was saying was that all of the evidence was going to have to prove it. At this point, he doesn't know who the burden of proof is on. He hasn't been instructed.
"MR. MOFFATT: It's like you said either this morning or yesterday, you have got to look at it all. I think he was expressing his opinion very concisely as to who he believes.
"THE COURT: Well, okay. I'll deny the motion then." (R. 562-66, 573-79).
Juror Turpen stated during voir examination that he felt the appellant was guilty and the defense would have to prove him not guilty. However, Turpen stated these were not fixed opinions and he would have to wait until he heard all of the evidence to determine the appellant's guilt or innocence and that he could follow the judge's instructions concerning the presumption of innocence. Based on this testimony, we do not conclude that Turpen had a fixed opinion as to the guilt of this appellant. The trial court's denial of the challenge for cause as to Turpen was not error. See Howard; Willingham v.State, 262 Ala. 550, 80 So.2d 280 (1955); Tucker v. State,429 So.2d 1165 (Ala.Crim.App. 1983); Peterson v. State, 227 Ala. 361,150 So. 156 (1933), cert. denied, 291 U.S. 661,54 S.Ct. 439, 78 L.Ed. 1053 (1934).
The voir dire examination of prospective juror Lovell is quoted below.
"MR. FRY: Yesterday, I asked you if you had read or heard anything about the case. I think you along with just about everybody else on the panel said you had. I ask you again, based on what you may have read or heard, is there any reason or anything that you may have read or heard that would prevent you from being able to sit on a jury and listen to the evidence and disregard what you may have read or heard and render a fair and impartial verdict?
"THE JUROR: I just read what the newspaper had and what was on the radio. I have no firsthand knowledge of it.
"THE COURT: But the question was, would that prevent you —
JUROR: Yes, I think I could be fair.
"MR. FRY: Do you believe everything you read in the newspaper?
"THE JUROR: No.
"MR. FRY: The newspaper, did it make any statement that someone was actually guilty of this crime?
"THE JUROR: Of course, it tends to make you want to believe that. *Page 387 
"MR. FRY: When you read that someone has been arrested, is there some kind of assumption they had something to do with it?
"THE JUROR: You assume that.
"MR. FRY: Would you hope that the police have arrested the right person?
"THE JUROR: Right.
"MR. FRY: Even based upon all that, is it your opinion and your feeling that you could lay whatever those feelings are aside and come in to this trial fresh and only listen to the evidence?
"THE JUROR: I think so.
"MR. FRY: And make a decision based on what the evidence is?
"THE JUROR: Yes.
"MR. FRY: Regardless of whatever your feelings may be about insanity or about anything else that comes up in the case, would you listen at the end of the case to Judge Blizzard's instructions and apply the law that he gives as far as insanity goes?
"THE JUROR: I could.
"MR. FRY: Regardless of whatever your personal feelings may have been with insanity?
THE JUROR: Yes.
"MR. FRY: I believe at the beginning of the trial the Judge gives an instruction that this Defendant is presumed to be innocent, that is, the presumption of law that he is innocent until proven guilty. Would you honor that presumption?
"THE JUROR: I would try my best.
"MR. FRY: You would do all in your power to follow the Judge's instructions; is that correct?
"THE JUROR: Yes.
"MR. FRY: As far as is humanly possible would you do that?
"THE JUROR: Yes.
"MR. FRY: If, at the conclusion of all the evidence that's presented, Mrs. Lovell, you were not convinced that the Defendant was guilty by the standard that's explained to you by the Judge, would you acquit the Defendant? That is, would you find him not guilty if you were not convinced that he was guilty beyond a reasonable doubt?
"THE JUROR: Would you repeat that? You got me confused.
"MR. FRY: If the State fails to prove to you in your own mind that the Defendant is guilty — if I fail to prove his guilt, would you come back and return a verdict of not guilty?
"THE JUROR: Yes.
"MR. FRY: And you realize it would be your duty to do that?
"THE JUROR: Yes.
"MR. FRY: That's all I have. Thank you.
"MR. BARKSDALE: Mrs. Lovell, I'm Jerry Barksdale. Were you one of the ladies yesterday that said you wanted to say something in private?
"THE JUROR: No.
"MR. BARKSDALE: After you heard and read about this case made through the media, did you have an opinion at that time as to who committed the crime?
"THE JUROR: Well, yes. You assume the person they arrested.
"MR. BARKSDALE: That would be the Defendant, Mr. Thomas?
"THE JUROR: Yes.
"MR. BARKSDALE: This morning as you sit right here, you and I talking, do you have a feeling as to whether or not he committed the crime?
"THE JUROR: Yes, I do.
"MR. BARKSDALE: What is that feeling?
"THE JUROR: I feel he's guilty from what I have read in the newspaper.
"MR. BARKSDALE: And is that a pretty well fixed feeling that you have?
"THE JUROR: Unless I see other evidence that he's not.
"MR. BARKSDALE: Who would have to offer that evidence?
"THE JUROR: You.
"MR. BARKSDALE: The defense would? *Page 388 
"THE JUROR: Right.
"MR. BARKSDALE: So is that a pretty fixed feeling with you, too?
 "THE JUROR: That you would? "MR. BARKSDALE: That we would have to offer evidence.
"THE JUROR: Yes.
"MR. BARKSDALE: So you do have a fixed opinion as to feeling that he's guilty at this time?
"THE JUROR: At this time, I do.
"MR. BARKSDALE: And you do have a fixed opinion that it would be our duty to prove that he's innocent to you; is that correct?
"THE JUROR: Yes.
"MR. BARKSDALE: That's a pretty solid fixed opinion?
"THE JUROR: Well, I would try to be fair. I think I could be fair.
"MR. BARKSDALE: But it is a fixed opinion?
"THE JUROR: Yes." (R. 361-67).
At the beginning of Lovell's voir dire examination, she stated she could set aside her personal opinions and would render a verdict based upon the evidence in the case and the court's instructions. However, upon further examination by defense counsel, Lovell indicated that she had a fixed opinion as to the appellant's guilt and the defense would have to prove the appellant innocent. While this is a very close question, we are unable to hold, as a matter of law, that the trial judge erroneously denied the challenge for cause as to Lovell.
"The decision of a trial court to disqualify a venireman based on a challenge grounded on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an erroneous abuse of discretion." Watwood v.State, 389 So.2d 549 (Ala.Crim.App.), cert. denied,389 So.2d 552 (Ala. 1980). See also Glenn v. State, 395 So.2d 102
(Ala.Crim.App. 1980), cert. denied, 395 So.2d 110 (Ala. 1981).
In Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885,81 L.Ed.2d 847 (1984), the U.S. Supreme Court addressed the question of whether to apply the statutory presumption of correctness [28 U.S.C. § 2254(d)] to a state trial court's decision concerning a denial of the defendant's challenge for cause.[1] In deciding that the statutory presumption of correctness should be applied to a trial court's resolution concerning challenges for cause, the Supreme Court gave two reasons.
 "First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning, e.g., United States v. Burr, 25 F.Cas. No. 14,692g, pp. 49, 51 (No. 14,692g) (CC Va. 1807) (Marshall, C.J.), usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.' E.g., Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502
(1984)."
Patton, 104 S.Ct. at 2892 (footnote omitted).
The reasons set out above are also the reasons this court gives great weight to a trial court's decision on challenges for cause.
In addressing whether there was fair support in the record for the trial court's *Page 389 
denial of the challenges for cause in Patton, the Supreme Court stated:
 "The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading."
Patton, 104 S.Ct. at 2893.
The U.S. Supreme Court's discussion, concerning two of the challenges for cause in Patton, is particularly relevant to the challenge for cause as to juror Lovell.
 "Similarly, in the case of alternate juror Pyott, we cannot fault the trial judge for crediting her earlier testimony, in which she said that she could put her opinion aside '[i]f [she] had to,' rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have. Id., at 246a, 250a-252a. Alternate juror Chincharick's testimony is the most ambiguous, as he appears simply to have answered 'yes' to almost any question put to him. It is here that the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty."
Patton, 104 S.Ct. at 2893.
In addition to the discussion in Patton, the following colloquy convinces us that the trial judge did not abuse his discretion by denying the challenge for cause to Lovell.
 "MR. BARKSDALE: Your Honor, we would like to challenge Mrs. Lovell for cause on the grounds that she has a fixed opinion as to the guilt or innocence of the Defendant, and she has a fixed opinion against the presumption of innocence. She said that she would not follow the insanity defense and if a person was insane, she still thought that they should be punished.
 "MR. FRY: I also heard her say that she would follow all of the instructions of the Court. The statement she made was not knowing what the law would be as explained to her. She said she would honor the presumption of innocence. She also said there was no reason why she couldn't set aside whatever opinion or assumption she may have about the case. I think that Mr. Barksdale used the term, fixed opinion. What she was construing to be fixed opinion and what he was construing as a legal term was probably two different things.
 "THE COURT: Let me say this for the record. I think we went through this yesterday. It reminds me of the old song, when I am not with the girl I love, I love the girl I'm with. I think we found that we can sit here and play ping pong, and people would more or less agree with whatever attorney was speaking with them at the time. Obviously, what we are running into is people at the moment they are being questioned agree with the attorney that's questioning them. They say, in effect, two different things. I think we have to listen to the whole set of questions.
 "Now, she says she can follow the law and she can apply the presumption of innocence. She says that she feels that he is guilty. The question is, whether the juror can subordinate the personal feelings that they have. The only way I know to do that is to take the total questions plus the observation of the prospective juror. In my opinion, there is *Page 390 
something to be gained by being able to observe a person, not only their answers on paper, but how they answer them and their general attitude towards the answers. I think the juror said that she could follow the law and put aside any feeling that she has. I will deny the challenge.
"Next juror, please." (R. 370-72).
 "Qualification of a juror is a matter within the discretion of the trial court and, on appeal, this court will look to the questions propounded and to the answer given by the prospective juror to see if this discretion was properly exercised. Alabama Power Co. v. Henderson, Ala., 342 So.2d 323, 327."
Collins v. State, 385 So.2d 993, 1000 (Ala.Crim.App. 1979),rev'd on other grounds, Ex parte Collins, 385 So.2d 1005 (Ala. 1980), on remand, 385 So.2d 1010 (Ala.Crim.App. 1980).
 " 'The sufficiency of the cause of challenge is determined by the trial court, and the inquiries are addressed to the conscience of the juror under oath. He is examined touching his qualifications, in the presence of the judge, who sees his manner of answering the questions, and the probing of his conscience, which is often times more clearly indicative of his disinterestedness or bias, than the mere words used. The reviewing court, therefore, should exercise caution, and the finding of the trial court should not be set aside, unless it affirmatively appears, that, on the answers of the juror, taken as a whole, he entertained a fixed opinion which would bias his verdict." (Emphasis added.)"
Nobis, 401 So.2d at 197 (quoting Peterson, 150 So. at 159).
When we view Lovell's testimony as a whole, we cannot say that it affirmatively appears that she had a fixed opinion as to the guilt of the appellant to the extent which would necessarily bias the verdict which she would be required to render. During the course of her examination, she stated that she felt she could be fair and could set aside her personal opinions and base her decision on the evidence presented at trial. She also indicated that she would try her best to abide by the trial judge's instruction that the appellant is presumed to be innocent. She realized she had a duty to find the appellant not guilty, if the State failed to prove their case. Obviously Lovell's answers were confusing and somewhat contradictory particularly when questioned by defense counsel.[2] *Page 391 
Therefore, we maintain that the trial judge was, indeed, in the best position to determine the total effect of Lovell's answers and make a decision based thereon. Thus, we do not find that the trial judge's denial of the challenge for cause as to juror Lovell was clearly erroneous, thus amounting to an abuse of discretion.
 B
The appellant also challenged seven members of the venire because they had an "entrenched bias against the insanity defense." Each of these challenges for cause was denied by the trial court and the appellant now asserts on appeal that the trial court erred in this matter.
"In addition to the grounds for challenge for cause under § 12-16-150, grounds for challenge for cause under the common law still exist, when not inconsistent with the section."Nobis, 401 So.2d at 197 (citations omitted). One of the common law grounds is bias against the insanity defense. See Nobis, supra.
 "When a common law ground is at issue there must be a showing of absolute bias leaving nothing to the discretion of the trial court, or there must be a mixed question of law and fact to be determined by the trial court exercising its sound discretion."
Nobis, 401 So.2d at 198 (citations omitted).
One of the appellant's challenges for cause was prospective juror Patterson. During voir dire examination, Patterson stated that he felt people were responsible for their acts whether they were mentally ill, drunk or sane. However, Patterson later testified that, if he were on the jury, he would follow the law rather than his own opinion. (R. 429-33).
Jurors Broadway and Boyd testified during voir dire that they felt that mentally ill people who commit crimes should be punished. However, both testified that they could follow the law as to insanity regardless of their personal feelings. (R. 222-29, 202-09).
Juror Eckstein testified that, if someone were insane when he committed a crime, he should be put away somewhere and, if that person didn't have a history of mental illness, he ought to be punished. At the end of voir dire, Eckstein did state that he was opposed to punishing someone who was legitimately insane at the time of the crime (R. 261-69).
Juror Gray testified that she would try her best to listen to the court's instructions on insanity and follow that statement of the law. She later stated that people should be treated the same no matter how retarded a person may be. She stated that, if an insane person committed a crime, he or she should be committed to an institution and that she could not send a mentally ill person to the electric chair. (R. 288-95).
Juror Lovell initially stated that she could listen to the instructions of the trial court and apply the law regardless of her feelings concerning the insanity defense. She later stated that insane people are responsible for their actions and should be punished. (R. 362-63, 367-70).
Juror Pack testified that he doesn't agree with people who commit crimes and then plead insanity. He said the insane need to be punished to keep them "off the streets." Initially, Pack stated that he would be able to follow the judge's instructions as to the law even if he disagreed with the law. (R. 414-22).
We have carefully reviewed the questions propounded to these jurors and the answers they gave during voir dire examination. After reviewing the testimonies of these prospective veniremen as a whole, we cannot say that any of these jurors possessed an absolute bias against the insanity defense itself.
Furthermore, all but one of these jurors stated, at one point or another, that they could apply the law according to the trial court's instructions regardless of their personal feelings. The other juror stated that a person should not be punished if he were *Page 392 
proven insane at the time of the crime at issue.
Thus, we find the trial judge did not abuse his discretion in his denial of these seven challenges for cause. There is no error to reversal here. See Nobis, supra.
 II
The appellant argues that his motion for change of venue should have been granted because he could not receive a fair and impartial trial in Limestone County, Alabama, due to extensive pre-trial publicity.
A defendant is entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried. Ala. Code, § 15-2-20 (1975); Nelson v. State, 440 So.2d 1130
(Ala.Crim.App.), cert. denied, 440 So.2d 1130 (Ala. 1983);Anderson v. State, 362 So.2d 1296 (Ala.Crim.App. 1978).
 "There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity 'has so saturated the community as to have a probable impact on the prospective jurors' and thus renders the trial setting 'inherently suspect.' McWilliams v. United States, 394 F.2d 41
(U.S.C.A. 8th Cir. 1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a 'pattern of deep and bitter prejudice' must exist in the community. Irvin v. Dowd, supra.
 "The second situation occurs when the defendant shows 'a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice.' McWilliams v. United States, supra."
Nelson, 440 So.2d at 1131-32.
The appellant, in support of his motion for change of venue, submitted twenty-nine newspaper articles to the trial court. (See R. 235-63). Two of these articles did not mention the appellant or this case. However, in most of these articles the appellant and his case were prominently mentioned. In many of these articles, the appellant's case was the main story within the article.
The offense with which the appellant was charged occurred on December 14, 1984. Nineteen of the articles submitted were published within six months of the crime and the majority of these were published within two months following the crime. There was over a three-month period when no articles concerning this case were in fact published. The other eight articles appeared in the six months before the appellant's trial began on March 17, 1986. Only one of these articles, however, was published within two months of the trial.
While we admit there was extensive pre-trial publicity[3]
concerning this case, this fact alone does not necessarily mean the appellant could not receive a fair and impartial trial.Fike v. State, 447 So.2d 850 (Ala.Crim.App. 1983), cert.denied, 447 So.2d 850 (Ala. 1984). The vast majority of the publicity surrounding this case took place immediately after the crime was committed and more than one year before the appellant's trial began. The passage of time between the crime and its accompanying publicity and the actual trial of the defendant cannot be ignored as a factor in bringing objectivity to the trial. Robinson v. State, 430 So.2d 883
(Ala.Crim.App.), cert. denied, 430 So.2d 883 (Ala. 1983); Langham v.State, 494 So.2d 910 (Ala.Crim.App.), cert. denied,494 So.2d 910 (Ala. 1986).
 "Generally newspaper articles which objectively report the commission of a crime, do not carry inflammatory headlines, and do not editorialize on the facts in a manner to inflame the community or create an atmosphere of prejudice are an insufficient basis on which to grant a motion for a change of venue. Gray v. State, 56 Ala. App. 131, 319 So.2d 750 (1975)."
Anderson, 362 So.2d at 1299-300.
We have reviewed the articles submitted by the appellant and find that all but one of *Page 393 
them were objective and factual and were merely articles detailing the crime and the developments in this appellant's case.
However, one of the articles could be considered prejudicial because it contained "sensational, accusational or denunciatory statements" concerning the appellant. McLaren v.State, 353 So.2d 24, 31 (Ala.Crim.App.), cert. denied,353 So.2d 35 (Ala. 1977).
This article appeared in the Athens News Courier on February 10, 1985 and contained the headline " 'Wild Man' Thomas hasextensive local arrest record." (R. 247). In this article, the appellant was accused of "savagely" murdering the victim. The article stated that the appellant had an "extensive past criminal record" and a "long history of arrests for both misdemeanors and felonies." The article then set out the appellant's arrests and convictions and the details concerning them. The article stated that "his [the appellant's] notoriety among law enforcement officials was one reason the suspect was arrested" and that he was out of prison as a result of the "good time law" at the time of the murder.
One of the statements in the article was that "Thomas' record shows he has never been arrested on any drug-related felony charge, although tatoos on his body might indicate he has more than passing knowledge of the world of illegal drugs." The article then detailed the numerous tatoos on the appellant's body and their location. The article states that the appellant goes by the nickname "Wild Man."
Although we do find that this article was inflammatory and intended to be sensational, we cannot say that the publication of this one article deemed the pre-trial publicity surrounding this case as a whole "inherently suspect."
The appellant has failed to demonstrate that this one prejudicial article had "so saturated the community as to have a probable impact upon the prospective jurors." The appellant made no showing as to the circulation of the Athens News Courier or even the number of prospective jurors who subscribed or read this newspaper.
Furthermore, there was no showing that any prospective juror read the prejudicial article. See Anderson (where this court held that there had been no showing that any prospective juror had read articles wherein the district attorney labeled the defendant as "garbage" and a "sadistic killer" and linked the defendant with separate and distinct criminal offenses.) Also this article was published one year before the appellant's trial began.
The appellant also submitted a public opinion survey (R. 225-29) in support of his motion for change of venue. Ninety-three people were contacted in connection with this survey. Of those persons, 81.1 percent indicated they recalled the murder. Of these persons, 44.8 percent learned of the murder through the newspaper and 16.7 percent learned of the murder through television. Of all the persons contacted, only 24.7 percent felt the appellant was definitely guilty and only 7.5 percent felt he was probably guilty. We do not find that this survey sufficiently demonstrates "a community saturated with inherently prejudicial information or feeling."Grayson v. State, 479 So.2d 69, 73 (Ala.Crim.App. 1984),aff'd, Ex parte Grayson, 479 So.2d 76 (Ala. 1985).
Thus, we do not find that the pretrial publicity in this case, including this one prejudicial article, even approached the magnitude of the prejudicial publicity condemned by the United States Supreme Court in Irvin v. Dowd, 366 U.S. 717,81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). See also Estes v. Texas,381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and Sheppard v.Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). "Outside influences had not so infiltrated the community at large as to render the existence of community prejudice against the appellant probable." Langham, 494 So.2d at 914.
The appellant's trial was not "utterly corrupted by press coverage." Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290,2302, 53 L.Ed.2d 344 (1977) (quoting Murphy v. Florida,421 U.S. 794, 95 S.Ct. 2031, 2035, *Page 394 44 L.Ed.2d 589 (1975)). See also Langham, 494 So.2d at 914.
 "In the absence of such 'inherently prejudicial publicity,' a showing of 'actual prejudice directed toward the accused resulting from the extensive publicity' must be shown. Anderson, supra, and cases cited therein. The usual method provided for showing actual jury prejudice to support a change of venue motion is an extensive and thorough voir dire examination of prospective jurors. Anderson, supra."
Arthur v. State, 472 So.2d 650 (Ala.Crim.App. 1984), rev'd onother grounds, 472 So.2d 665 (Ala. 1985), on remand,472 So.2d 670 (Ala.Crim.App. 1985). See also Ex parte Grayson.
The voir dire examination in this case consisted of more than 600 pages of the transcript. The voir dire was extensive and thorough as to each prospective juror's knowledge of the case and any bias which he or she may have had based on his knowledge of the case. See Fike; Arthur, supra.
At the beginning of voir dire, every member of the venire stated he or she had read or heard about this case. As stated earlier, widespread publicity does not necessarily mean that an accused cannot get a fair and impartial trial,Anderson, particularly in "these days of swift, widespread and diverse methods of communications." Nelson, 440 So.2d at 1131
(quoting Irvin).
Qualified jurors need not be totally ignorant of the facts and issues involved in a particular case in order to render an unbiased verdict. Dobbert; Murphy; Irvin; Anderson; Nelson;Robinson.
Although all of the sixty-seven prospective jurors indicated that they had heard about the case, only one indicated he had a fixed opinion as to the guilt of the appellant based on what he had read or heard. This juror was excused.
The appellant challenged seven other prospective jurors on the basis that they had a fixed opinion as to the guilt of the appellant. We have previously discussed three of these challenges and found that the challenges were properly denied by the trial court because the jurors' opinions were not fixed to the point that they would be unable to reach an unbiased verdict after listening to all of the evidence and the law and instructions given to them by the court. None of these three jurors sat on this jury panel.
Two of the other jurors challenged for cause stated they had a bias against the appellant based on a connection with the victim's family. These two jurors were excused. The two other jurors had a bias against the appellant because they had discussed the case with law enforcement officials and firemen involved in the case. These jurors were also excused.
Thus, the only juror who demonstrated a fixed opinion as to the appellant's guilt based on pre-trial publicity was excused. Therefore, the appellant has failed to show a connection between the pre-trial publicity and the existence of actual jury prejudice. Langham.
We find no error in the trial court's denial of the appellant's motion for change of venue. (Authorities herein cited.)
 III
During the presentation of its case, the defense called Annie Ratliff, the appellant's mother, as a witness. Mrs. Ratliff testified that one of her other sons, Billy, got up early on the morning of December 15, 1984 and went to the scene of this crime. When Billy returned to his home, he went into the living room, fell down and "started patting his hands on the floor." (R. 1516). When Mrs. Ratliff attempted to testify as to what Billy said at this time, the State objected on hearsay grounds and the trial judge sustained the objection. Defense counsel then made an offer of proof, outside the presence of the jury, as to what Billy had said on this occasion. Mrs. Ratliff testified that Billy said, "Mom, I did not know Kenneth [the appellant] was going to come up there." (R. 1517). The trial judge once again sustained the State's objection.
The appellant now asserts the trial court erroneously excluded Mrs. Ratliff's testimony *Page 395 
concerning what Billy told her that morning. He contends this statement was not introduced to prove the truth of the matter asserted but to prove that Billy was at the scene of the crime and may have committed the murder himself.
As a general rule, an accused may introduce any legal evidence that tends to show that someone else committed the crime for which he is charged. Green v. State, 258 Ala. 471,64 So.2d 84 (1953). See generally C. Gamble, McElroy's AlabamaEvidence, § 48.01(1) (3rd ed. 1977); Schroeder, Hoffman and Thigpen, Alabama Evidence, § 4-4(a)(c) (1987).
However, hearsay evidence is not legal evidence and is not admissible to show that someone other than the accused committed the offense at issue. Houston v. State, 208 Ala. 660,95 So. 145 (1923). See also McDonald v. State, 241 Ala. 172,1 So.2d 658 (1941); Morris v. State, 25 Ala. App. 175, 142 So. 685
(1932).
 "A defendant can disprove his guilt by proving the guilt of some other person. Brown v. State, 120 Ala. 342, 25 So. 182; McDonald v. State, 165 Ala. 85, 51 So. 629. But this must be done by legal evidence, and not by the testimony of witnesses who heard another admit that he committed the offense; this is the merest hearsay — is but an extrajudicial confession or admission not admissible in evidence. Welsh v. State, 96 Ala. 92, 11 So. 450; Underhill on Criminal Evidence (2d Ed.) p. 276, § 145."
Houston, 208 Ala. at 663, 95 So. 145.
Furthermore,
 "[e]ven though one accused of a crime may show his innocence by proof of the guilt of another, provided the evidence relates to the res gestae of the offense, such evidence must exonerate the accused. As stated in Blevins v. State, 51 Ala. App. 214, 283 So.2d 664 (1973):
 " 'While it is always proper and relevant for accused to show that someone else committed the crime without his aid or participation, the admissibility of evidence offered to establish such fact depends on the circumstances of the case as well as the character of the evidence offered; but in general competent evidence which tends to prove that another committed the crime for which the accused is being tried is admissible if it is inconsistent with the guilt of the accused.' (Emphasis supplied). (283 So.2d [at] 670)"
Allen v. State, 382 So.2d 1147, 1156 (Ala.Crim.App.), cert.denied, 382 So.2d 1158 (Ala. 1980).
Here, the excluded evidence would not have exonerated this appellant. It was merely evidence that Billy may have also been present at the victim's house on the night in question and may have also participated in her death. This evidence is in no way inconsistent with the appellant's guilt. In fact, it is more consistent with the appellant's guilt because this evidence placed him at the scene of the crime!
In Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038,35 L.Ed.2d 297 (1973), the United States Supreme Court reversed a conviction in which the defendant, Chambers, had tried to introduce evidence at trial that another committed the murder for which he was charged. In Chambers, the Court suggested that "it may violate due process to deny a defendant the right to introduce evidence that another committed the crime with which that defendant was charged." Schroeder, Hoffman and Thigpen, § 4.4 (fn. 147).
However, the facts of Chambers are readily distinguishable from the case at bar. In Chambers, the defendant was arrested for the murder of a police officer. Following Chambers' arrest, another person, Gable McDonald, made a written confession to that murder. This confession was later repudiated by McDonald. McDonald also confessed to three friends on separate occasions that he had killed the police officer.
At trial, defense counsel called McDonald as a witness. However, the trial court did not allow defense counsel to question McDonald as an adverse witness because, under the Mississippi common law "voucher rule," a party may not impeach his own witness. Therefore, defense counsel could not cross-examine McDonald as to the circumstances *Page 396 
of his confessions and his repudiation of his written confession.
Further, the trial court excluded the testimony of McDonald's three friends concerning McDonald's confession to them on hearsay grounds.
The U.S. Supreme Court reversed Chambers' conviction and found that Chambers had been denied due process because he was not allowed to question McDonald as an adverse witnessand because he was not allowed to introduce the testimonies of McDonald's friends concerning his confessions to them.
In determining that the hearsay statements of McDonald's three friends should have been allowed in evidence, the Supreme Court decided that the hearsay statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." Chambers, 93 S.Ct. at 1048.
The reasons for this determination were that "each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred," "each one was corroborated by some other evidence in the case," "the sheer number of independent confessions provided corroboration for each" and "each confession . . . was in a very real sense self-incriminatory and unquestionably against interest."Chambers, 93 S.Ct. at 1048.
The court also emphasized the significance of the fact that McDonald was available at trial and also for cross-examination by the State.
In the case at bar, we do not find any of the assurances of reliability that were present in Chambers. At the guilt phase of the trial, the lone hearsay statement was not corroborated by any other evidence and it was not "unquestionably" against Billy's interest. Billy's statement was made to his and the appellant's mother. Moreover, Billy did not testify at this trial and thus could not be cross-examined by the State.
However, the most important distinction between this case and Chambers is the effect of the excluded evidence on the guilt or innocence of the person on trial.
In Chambers, the hearsay statements which pointed to the guilt of McDonald also pointed to the innocence of Chambers. Here, as stated earlier, Billy's statement was possibly evidence of Billy's guilt in this crime but it was not evidenceof the innocence of this appellant or inconsistent with the guilt of this appellant. See Blevins; Allen.
Thus, we find that the trial judge did not abuse his discretion by excluding Billy's hearsay statement made to his mother. See Alldredge v. State, 431 So.2d 1358 (Ala.Crim.App. 1983).
 IV
This court is required by § 13A-5-53, Code of Alabama 1975, to review the propriety of the appellant's death sentence and to examine the record for any errors adversely affecting his conviction. We have thoroughly reviewed this record and find no error adversely affecting this appellant's rights. See Beck v.State, 396 So.2d 645 (Ala. 1980); Rule 45A, A.R.A.P.
The trial court found the existence of two aggravating circumstances in this case: (1) "The capital offense was committed while the defendant was engaged in the act of burglary in the first degree" (§ 13A-5-49(4)) and (2) "The capital offense was especially heinous, atrocious and cruel compared to other capital offenses." (§ 13A-5-49(8)).
As stated by the trial court in the sentencing order (which is attached to this opinion as Appendix A), the first aggravating circumstance is established by the jury's verdict and is supported by the evidence in this case. The second aggravating circumstance is clearly supported by the facts included in this record. The appellant broke into the victim's home during the early morning hours and attacked this eighty-two year old victim while she slept in her bed. The victim's body was mutilated especially in the area of her vagina and rectum. She died from suffocation as a result of an object being placed in her mouth. After the victim's death, her home was ransacked and then set on fire. These facts convince this court that this capital offense was especially heinous, atrocious *Page 397 
and cruel. See Grayson v. State, 479 So.2d 69 (Ala.Crim.App. 1984), aff'd, Ex parte Grayson, 479 So.2d 76 (Ala. 1985), cert.denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985);Kennedy v. State, 472 So.2d 1092 (Ala.Crim.App. 1984), aff'd,Ex parte Kennedy, 472 So.2d 1106 (Ala. 1985), cert.denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
The trial court did not find the existence of any statutory or non-statutory mitigating circumstances and this finding is also supported by this record.
We do not find evidence in the record that the appellant's sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. This court has also independently weighed the aggravating and mitigating circumstances and we are convinced that death is the proper sentence in this case.
The appellant's sentence of death is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant. See Grayson; Kennedy; Thompson v. State,503 So.2d 871 (1986) affirmed Thompson v. State, 503 So.2d 887
(Ala. 1987).
This court has carefully searched the record for plain error and we find none. The appellant's conviction for this capital offense, as well as his convictions for robbery, arson and sexual abuse in the first degree, and his sentence of death are proper as herein stated.
The judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.
APPENDIX A
In the Circuit Court for Limestone
County, Alabama
State of Alabama
vs.
Kenneth Glenn Thomas, Defendant.
Case Number CC-85-74
 SENTENCING ORDER
The Defendant was charged by indictment with the murder of Flossie McLemore during a burglary in the first degree, a capital offense. The Defendant was also charged in the same indictment by separate counts of the offense of arson in the first degree, robbery in the first degree, and sexual abuse in the first degree. A jury returned a verdict on March 26, 1986 finding the Defendant guilty of the capital offense and guilty of arson in the first degree, robbery in the first degree, and sexual abuse in the first degree, whereupon, the Court adjudged the Defendant guilty on each count in accordance with the jury's verdict.
Following the adjudication of guilt, a separate sentencing hearing was conducted before the same jury and the jury returned a recommendation that the Defendant be sentenced to death.
The Court has Ordered and received a written pre-sentence investigation report and has conducted an additional sentence hearing pursuant to Section 13A-5-47, Code of Alabama, 1975. At the sentence hearing, the State, through its District Attorney, urged that the Court fix the Defendant's punishment at death. The Defendant, through his counsel, argued that the Court should fix his punishment at life imprisonment without parole.
Findings of fact summarizing the crime and the Defendant'sparticipation in it.
The body of Flossie McLemore, age 82, was found at her home on the early morning hours of December 15, 1984. Mrs. McLemore lived alone in her home on East Street in the City of Athens, Alabama. At the time of the discovery of Mrs. McLemore's body an extensive fire had damaged the house and the home had been ransacked. The cause of death was listed by the medical examiner as suffocation by having a blunt instrument placed in her mouth and throat. Her body had received multiple stab wounds. She had suffered broken ribs, superficial cuts to her throat, mutilation of her abdomen and mutilation of her rectum and vagina. There were cuts to her mouth, severe trauma to one *Page 398 
side of the mouth and multiple bruises to the body. Across the street from the side of her home investigating officers discovered the Defendant's parked car and the Defendant inside. He was in the possession of a knife and had a cut to his hand. There was blood on his clothing and a later investigation revealed one of his fingerprints inside the house and the key to his car was also located inside the house. A sum of money was also located in his possession at the time of his arrest and he was intoxicated. Other forensic evidence was found indicating the presence of the Defendant in the house.
Findings concerning the existence or non-existence ofaggravating circumstances.
In compliance with the requirements of the law that the Trial Court shall enter specific findings concerning the existence or non-existence of each aggravating circumstance enumerated by statute, the Court finds that none of the aggravating circumstances enumerated by the statute were proved beyond a reasonable doubt and the proceedings before the Court except the following, which the Court finds were proved beyond a reasonable doubt:
1. The capital offense was committed while the Defendant was engaged in the act of burglary in the first degree. The jury's verdict establishes the existence of this aggravating circumstance and the verdict is supported by the evidence.
2. The capital offense was especially heinous, atrocious and cruel compared to other capital offenses. The Court reaches this conclusion that this aggravating circumstance existed based upon the following evidence:
a. The victim of the crime was an elderly lady, age 82.
b. The mutilation of Mrs. McLemore's body particularly to the vagina and rectum were evidence of extreme cruelty and depravity.
c. The manner of death, the placing of a blunt instrument in the mouth which was done in a manner as to cause trauma to the mouth was especially repulsive, unusual and cruel and undoubtedly resulted in great suffering to the victim.
d. The body received other types of trauma such as bruises, cutting of the throat, breaking of ribs and being stabbed repeatedly with a knife, which the Court finds from the evidence is physical abuse to her person.
By any standard acceptable to a civilized society, this crime was exceedingly vicious and brutal. The victim was subject to a high degree of pain and anguish. While this Court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, in this case the degree of violence to the person of Mrs. McLemore exceeds that which is common to all capital offenses.
Findings concerning the existence or non-existence ofmitigating circumstances.
In compliance with the statutory requirement that the Trial Court enter specific findings concerning the existence or nonexistence of each mitigating circumstance enumerated by statute, the Court finds that none of the following mitigating circumstances exist in this case:
1. That the Defendant has no significant history of prior criminal activity. The Defendant was shown by the preponderance of the evidence to have a significant history of criminal conduct. He was convicted in 1983 of burglary in the third degree, in 1983 of receiving stolen property in the second degree, in 1982 he was convicted of receiving stolen property in the second degree, in 1980 he was convicted of the possession of a forged instrument in the second degree.
2. That the capital offense was committed while the Defendant was under the influence of extreme or emotional disturbance. The Defendant was examined by two psychiatrists at the Taylor-Hardin Secure Medical Facility under the order of this Court. Each of these psychiatrists examined the Defendant and found no mental illness or defect and in each of their opinions the Defendant did not suffer from a mental disease or defect at the time of the offense. The Defendant introduced testimony by psychologists which they contended to show mental disease or defect. *Page 399 
While the Court recognizes that this mitigating circumstance contemplates a disturbance of mind which might exist separate and apart from a mental disease or defect and that the Court is not bound by the testimony of expert witnesses, the Court finds from a consideration of all the evidence that the Defendant was not under the influence of extreme mental or emotional disturbance at the time the capital offense was committed.
3. That the victim was a participate in the Defendant's conduct or consented to it. There is no evidence to support this mitigating circumstance in this case.
4. That the Defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor. There is no support for this mitigating circumstance under the evidence presented.
5. The Defendant acted under extreme duress or under the substantial influence of another person. There is no support for this mitigating circumstance under the evidence presented.
6. That the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Defendant entered a plea of not guilty by reason of mental disease or defect. With regard to this defense, the Court instructed the jury that a person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, such person lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. By its verdict of guilty the jury found the evidence insufficient to support the plea of not guilty by reason of mental disease or defect and the jury's finding is supported by the evidence. While the Court recognizes that the Court is not bound by the findings of the jury in this respect and that the Court recognizes that this mitigating circumstance contemplates impaired capacity which might exist separate and apart from a mental disease or defect, the Court finds from a consideration of the testimony of the expert witnesses who testified in this case that this mitigating circumstance does not exist.
7. Age of the Defendant at the time of the crime. The Defendant was twenty-four years of age at the time this capital offense was committed. The Court finds from the evidence that the Defendant's age was not a mitigating factor at the time of the crime.
The Court having considered whether there are any mitigating circumstances not enumerated by statute which are shown by the evidence to exist in this case, the Court finds, therefore, that the evidence does not support any finding that there are any mitigating circumstances in this case not enumerated by statute.
 CONCLUSION
The Court having found that there are two aggravating circumstances in this case and that there are no mitigating circumstances in this case and having given consideration of the recommendation of the jury contained in its advisory verdict, it is the judgment of this Court that the aggravating circumstances outweigh mitigating circumstances shown by the evidence in this case. Accordingly it is ORDERED, ADJUDGED AND DECREED by the Court that the Defendant be punished by death.
A formal sentencing entry will be made by separate order.
 (s) Henry W. Blizzard ----------------- CIRCUIT JUDGE
[1] The defendant in Patton was convicted in the State of Pennsylvania and his conviction was upheld by the Supreme Court of that state on direct appeal. The defendant then sought habeas corpus relief in the Federal Courts. The Federal District Court reviewed the trial court's denial of the defendant's challenges for cause and affirmed the trial court's finding on this matter. The Third Circuit Court of Appeals reversed the District Court's decision. The United States Supreme Court granted certiorari to determine whether the pre-trial publicity surrounding the defendant's case made a fair trial impossible in the county in which he was tried and also considered the defendant's objections to the trial court's denial of his challenges for cause.
[2] As noted by the Supreme Court of Alabama in Ex Parte Beam,512 So.2d 723 (Ala. 1987) in reversing the trial court for failing to grant the defendant's challenge for cause, the Supreme Court of Alabama stated the following:
 "The State urges our affirmance on the authority of two propositions set forth in Clark v. State, 443 So.2d 1287
(Ala.Cr.App. 1983): 1) 'A trial court's ruling on challenge for cause based on bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion'; and 2) 'a juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair.' "
 "Although we agree with the State's first proposition, the test for determining the propriety of the trial court's ruling in such cases must be measured against the defendant's constitutional right to a fair trial. No right of an accused felon is more basic than the right to 'strike' a petit jury from a panel of fair minded, impartial prospective jurors."
The court in applying the principles with reference to peremptory challenges and challenges for cause, indicated there that, because of the equivocal nature of the prospective juror, Mrs. Jones', statement that she could not say that she would put the use of alcohol out of her mind, the court erred in failing to grant the challenge.
Similarly, and more recently, the Supreme Court of Alabama reversed the cause entitled Rutledge v. State, 523 So.2d 1118
(Ala. 1988), pointing out that a bias of a prospective juror toward the Southern Poverty Law Center and its attorney was under Beam, supra, a proper basis for determining that the trial court abused its discretion in denying the defendant's challenge of the juror in Rutledge.
We have carefully considered both of these cases and others decided by our Supreme Court and believe that the trial court here was in the best position to observe the demeanor of the prospective juror, the contradictory statements made and the explanations thereafter given by the prospective jurors and the opposing attorneys. The trial judge saw the expression, understood the tone of voice and the answers given. In light of the foregoing, we are of the view that our statements referring to Patton v. Yount, supra, support and sustain the trial judge in his decision not to grant the challenges in the instant cause. We see no abuse of discretion here. We do concede that this is a very close question, particularly in light of the testimony of the prospective juror, Lovell.
[3] While we are sure that there was also extensive television and radio coverage of this case, there is no evidence to this effect in the record.